**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

TONY G. HEWITT,                                )        3:12-cv-00202-LRH-WGC
                                               )
       Plaintiff,                       )        **REPORT AND RECOMMENDATION**
                                               )        **OF U.S. MAGISTRATE JUDGE**
   vs.                                      )
                                               )
RUBEN VIDAURRI, et. al.                         )
                                               )
       Defendants.                      )
                                               )
_____)

This Report and Recommendation is made to the Honorable Larry R. Hicks, Senior United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB 1-4. Before the court is Defendants Motion for Summary Judgment. (Doc. # 38, Doc. # 45 (errata).)[1] Plaintiff opposed (Docs. # 43,# 44)[2] and Defendants filed a reply (Doc. # 50).

After a thorough review, the court recommends that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

At all relevant times, Plaintiff Tony G. Hewitt was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl. (Doc. # 4) at 1.) The events giving rise to this litigation took place while Plaintiff was housed at Warm Springs Correctional Center (WSCC). (*Id.*) Plaintiff, a pro se litigant, brings this action pursuant to 42 U.S.C. § 1983. (*Id.*) Defendants

---

[1] Refers to court's docket number. The errata (Doc. # 45) is merely a signed version of defendant Martinez's declaration filed in support of Defendants' motion.

[2] Doc. # 43 is Plaintiff's statement of undisputed facts. Doc. # 44 is Plaintiff's responsive brief.

are Robert Martinez, Jessie Neubauer, and Ruben Vidaurri. (*See* Docs. # 3, # 4, # 5.)[3]

In Count I, Plaintiff alleges that upon his return to WSCC from five days at Carson Tahoe Hospital for heart pain and related issues, he went outside to the yard for recreation time. (Doc. # 4 at 5.) He contends that defendant Vidaurri closed the door behind him, and Plaintiff found he could barely see in the fenced-in area due to smoke from a nearby ritual. (*Id.*) He claims the smoke caused him to choke, have chest pains and dizziness. (*Id.*) He used the intercom to ask to be able to return inside. (*Id.*) He alleges Vidaurri refused his request and told him he should not have gone outside during the ritual. (*Id.* at 5-6.) After thirty minutes, Plaintiff asserts he was choking and near unconsciousness and suffered from severe chest pain, and was escorted to medical by another officer. (*Id.* at 6.) He claims that when he returned Vidaurri threatened him several times not to say anything about his conduct. (*Id.*) He further alleges that he asked defendant caseworker Neubauer, who is aware of his medical problems, to move him to another unit where he could go outside without smoke exposure, but Neubauer denied his requests. (*Id.* at 6-7.) Plaintiff contends that his chest pain and breathing problems have significantly worsened. (*Id.* at 7.) The court determined that he states a colorable claim for deliberate indifference to a serious medical need under the Eighth Amendment against defendants Vidaurri and Neubauer. (Doc. # 3.)

In Count II, Plaintiff alleges that his cellmate repeatedly threatened to kill him, and Plaintiff informed Neubauer, Vidaurri, and Schobert of the threats. (Doc. # 4 at 8.) One day, when his cell door opened, Plaintiff's cellmate ran to Vidaurri and claimed Plaintiff was threatening him and Vidaurri and Martinez ran to Plaintiff's cell and Vidaurri slammed Plaintiff face-first against the wall, pinned his arms behind his back and bent him backwards. (*Id.* at 9-10.) Plaintiff claims that he screamed that he had a dialysis pump in his arm, and that Vidaurri knew Plaintiff has a fractured tail bone and sciatica. (*Id.* at 10.) Plaintiff contends that

---

[3]Defendants continue to file documents on behalf of defendants Mattice and Schober (named by Plaintiff as Schobert). Mattice is no longer a defendant as he was only named in Count III, which was dismissed by the court. (*See* Doc. # 5.) In addition, while Schober was mentioned in the complaint, the court did not find that Plaintiff stated a colorable claim as to him. (*See* Doc. # 3.)

1   Vidaurri "body slammed" him, cutting his left leg open and causing his feet and legs to go
2   numb, and handcuffed and dragged Plaintiff (without his walking device) to another cell. (*Id*.
3   at 10-11.) He claims that he was in severe pain but received no medical attention. (*Id*.) He
4   alleges that Martinez watched the whole incident and did nothing. (*Id*. at 10.) The court
5   concluded that these allegations state a colorable Eighth Amendment excessive force claim
6   against defendants Vidaurri and Martinez. (Doc. # 3.)

7   Count III was dismissed because Plaintiff failed to timely file an amended complaint
8   correcting the deficiencies outlined in the original screening order. (*See* Doc. # 5.)

9   Defendants move for summary judgment arguing that defendants Vidaurri and
10  Neubauer were not deliberately indifferent to Plaintiff's serious medical need and that
11  defendants Vidaurri and Martinez did not use excessive force against Plaintiff. (Doc. # 38.)

12  ## II. LEGAL STANDARD

13  "The purpose of summary judgment is to avoid unnecessary trials when there is no
14  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*,
15  18 F.3d 1468, 1471 (9th Cir.  1994) (citation omitted). All reasonable inferences are drawn in
16  favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir.  2008) (citing
17  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). Summary judgment is appropriate
18  if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that
19  there is no genuine issue as to any material fact and that the movant is entitled to judgment as
20  a matter of law." *Id*. (quoting Fed.R.Civ.P. 56(c)).[4] Where reasonable minds could differ on the
21  material facts at issue, however, summary judgment is not appropriate. *See Anderson*, 477 U.S.
22  at 250.

23  The moving party bears the burden of informing the court of the basis for its motion,
24  together with evidence demonstrating the absence of any genuine issue of material fact.

25

26      [4]Federal Rule of Civil Procedure 56 was amended in 2010 to state: "The court shall grant summary
27  judgment if the movant shows that there is no genuine *dispute* as to any material fact and the movant is entitled
    to judgment as a matter of law." (Emphasis added.) The analysis under the cases cited, however, remains the same.
28

1   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the parties may submit evidence

2   in an inadmissible form, only evidence which might be admissible at trial may be considered

3   by a trial court in ruling on a motion for summary judgment.  Fed.R.Civ.P. 56(c).

4       In evaluating the appropriateness of summary judgment, three steps are necessary: (1)

5   determining whether a fact is material; (2) determining whether there is a genuine issue for the

6   trier of fact, as determined by the documents submitted to the court; and (3) considering that

7   evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As

8   to materiality, only disputes over facts that might affect the outcome of the suit under the

9   governing law will properly preclude the entry of summary judgment; factual disputes which

10   are irrelevant or unnecessary will not be considered. *Id.*  at 248.

11       In determining summary judgment, a court applies a burden shifting analysis.  "When

12   the party moving for summary judgment would bear the burden of proof at trial, 'it must come

13   forward with evidence which would entitle it to a directed verdict if the evidence went

14   uncontroverted at trial.'[ ] In such a case, the moving party has the initial burden of

15   establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R.*

16   *Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal

17   citations omitted). In contrast, when the nonmoving party bears the burden of proving the

18   claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence

19   to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the

20   nonmoving party failed to make a showing sufficient to establish an element essential to that

21   party's case on which that party will bear the burden of proof at trial. *See Celotex*, 477 U.S. at

22   323-25. If the moving party fails to meet its initial burden, summary judgment must be denied

23   and the court need not consider the nonmoving party's evidence. *See Adickes v. S.H. Kress &*

24   *Co.*, 398 U.S. 144, 160 (1970).

25       If the moving party satisfies its initial burden, the burden shifts to the opposing party

26   to establish that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v.*

27   *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a factual dispute,

28

4

1 the opposing party need not establish a material issue of fact conclusively in its favor. It is

2 sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the

3 parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors*

4 *Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quotation marks and citation omitted). The

5 nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations

6 that are unsupported by factual data. *Id.* Instead, the opposition must go beyond the assertions

7 and allegations of the pleadings and set forth specific facts by producing competent evidence

8 that shows a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324.

9      At summary judgment, a court's function is not to weigh the evidence and determine the

10 truth but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

11 While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be

12 drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not

13 significantly probative, summary judgment may be granted. *Id.* at 249-50, 255 (citations

14 omitted).

15

### III. DISCUSSION

16 **A. Eighth Amendment-Deliberate Indifference to Serious Medical Need**

17      **1. Legal standard**

18      A prisoner can establish an Eighth Amendment violation arising from deficient medical

19 care if he can prove that prison officials were deliberately indifferent to a serious medical need.

20 *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "The requirement of deliberate indifference is less

21 stringent in cases involving a prisoner's medical needs than in other cases involving harm to

22 incarcerated individuals because '[t]he State's responsibility to provide inmates with medical

23 care ordinarily does not conflict with competing administrative concerns.'" *McGuckin v. Smith*,

24 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104

25 F.3d.  1133 (9th Cir.  1997).  "In deciding whether there has been deliberate indifference to an

26 inmate's serious medical needs, [the court] need not defer to the judgment of prison doctors

27 or administrators." *Hunt v.  Dental Dep't*, 865 F.2d 198, 200 (9th Cir.  1989).

28

A finding of deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's responses to that need." *McGuckin*, 974 F.2d at 1059; *see also Akhtar v.  Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v.  Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *Akhtar*, 698 F.3d at 1213 ("First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain."). Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id*. at 1059-60; *see also Lopez v.  Smith*, 203 F.3d 1122, 1131 (9th Cir.  2000) (quoting *McGuckin* and finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical needs are serious, Plaintiff must show that Defendants acted with deliberate indifference to those needs. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.  2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under § 1983.  *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (quoting *Jett*, 439 F.3d at 1096) (This second prong…is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

indifference."); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir. 2002) (quoting *Farmer*, 511 U.S. at 858). "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment" or the express orders of a prisoner's prior physician for reasons unrelated to the medical needs of the prisoner. *Hunt*, 865 F.2d 198, 201 (9th Cir. 1989) (internal quotation marks and citation omitted). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

In addition, "[a] difference of opinion between a physician and the prisoner-or between medical professionals-concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)). To establish deliberate indifference, the inmate "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances" and that the course of treatment was chosen "in conscious disregard of an excessive risk to [the prisoner's] health." *Id.* at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

**2. Analysis**

Defendant Vidaurri is employed by NDOC as a correctional officer at WSCC, assigned to Unit 4B during the relevant time period. (Doc. # 38 at 2, Doc. # 38-1 (Vidaurri Decl.) ¶¶ 1, 7.) He submits his declaration wherein he states that his recollection is that Plaintiff was allowed out on the yard, and shortly thereafter asked to be let back into the unit due to excessive smoke from the Native American grounds which supposedly affected a pre-existing medical condition. (Doc. # 38 at 2, Vidaurri Decl. ¶ 8.) Vidaurri maintains that at the time he had no knowledge of Plaintiff's medical issues. (Doc. # 38 at 2, Vidaurri Decl. ¶ 9.) Vidaurri told Plaintiff he was not allowed back in the unit until door call or door turnaround, which may have been around every thirty minutes because this unit was a controlled or management movement unit with specific door call/turnaround times so that staff would not be required to continually open and close doors and so that staff could keep track of inmates in an easier

fashion. (Doc. # 38 at 3, Vidaurri Decl. ¶ 10.) In addition, Vidaurri checked out Plaintiff's claim regarding the smoke and found the smoke on the yard at that time to be minimal. (Doc. # 38 at 3, Vidaurri Decl. ¶ 11.) He estimates the distance between the Native American grounds and the Unit 4 yard is between 100 and 120 feet. (*Id*.) According to Vidaurri, Plaintiff went to the infirmary shortly thereafter to be evaluated for alleged smoke inhalation. (Doc. # 38 at 3, Vidaurri Decl. ¶ 12.) Vidaurri spoke with a nurse who informed him that Plaintiff's vitals were fine and that there was nothing wrong with him. (*Id*.) Cell transfers were not within the range of his responsibilities, however, he does recall having a conversation with defendant Neubauer wherein she told him that she was not going to allow Plaintiff "a convenience bed move, and that it was not medically necessary, or words to that effect." (Doc. # 38 at 3, Vidaurri Decl. ¶ 15.)

Defendant Neubauer is employed by NDOC as a caseworker at WSCC. (Doc. # 38 at 3, Doc. # 38-3 (Neubauer Decl.) ¶ 1.) Her duties including classification and housing of inmates. (Doc. # 38 at 3, Neubauer Decl. ¶ 2.) During the relevant time period, she was assigned to WSCC, Unit 4B, general population housing. Plaintiff's NOTIS Movement History Report reflects that Plaintiff was first placed in unit 4B on November 9, 2011, after his return from Carson Tahoe Hospital. (Doc. # 38 at 4, Neubauer Decl. ¶ 7.) On December 13, 2011, Neubauer recorded that Plaintiff requested a move to Unit 2 because he claimed he was allergic to smoke coming from the Native American grounds located near Unit 4. (Doc. # 38 at 4, Neubauer Decl. ¶ 8.) Prior to this, Neubauer was not aware that Plaintiff had any medical restrictions. (Doc. # 38 at 4, Neubauer Decl. ¶ 9.) She contacted WSCC medical per Plaintiff's request and inquired whether he had a medical restriction regarding his claim that he was allergic to smoke. (Doc. # 38 at 4, Neubauer Decl. ¶ 10.) She also asked whether it was noted in his medical file that it was medically necessary for a bed move to Unit 2, and was informed that there were no restrictions noted and that a bed move was not medically necessary. (*Id*.)

In fact, Neubauer recalls Plaintiff approaching her prior to this time requesting a bed move two Unit 2 because that is where his friends were located and where he preferred to live.

1    (Doc. # 38 at 4, Neubauer Decl. ¶ 12.) This request had been refused because there were no

2    available beds in Unit 2 at the time. (*Id*.) Neubauer claims that had she been informed that

3    Plaintiff had a medical restriction relative to the smoke, she would have made necessary

4    arrangements. (Doc. # 38 at 4, Neubauer Decl. ¶ 16.) According to Neubauer, Unit 4's yard is

5    approximately the size of a basketball court and while it is located near the Native American

6    grounds, there is some distance and it is out in the open air, so any smoke from the Native

7    American rituals dissipated quickly, and did not enter the actual housing unit. (Doc. # 38 at 4,

8    Neubauer Decl. ¶ 17.)

9         Defendants acknowledge that Plaintiff had substantial pre-existing medical conditions,

10   including back issues, chest pain, heart and kidney disease; however, they maintain that he had

11   no restriction that would have put them on notice that he could not be on the yard or that he

12   needed a bed transfer to a different unit. (Doc. # 38 at 8.) His medical records reflect that on

13   November 27, 2011, Plaintiff was seen by nursing and reported that his lungs were burning, and

14   that he did not appreciate being locked out of his unit and subjected to the smoke. (*Id*., Doc.

15   # 39-1 at 7, 71.) He was examined, and appeared in no acute distress. (*Id*.) His lungs were clear

16   and he denied any chest pain. (*Id*.) He was told to avoid cold air and to avoid going out on the

17   yard on Sundays if smoke was a problem. (*Id*.) On the same day, he submitted a medical kite

18   requesting a move back to Unit 2 for health reasons including heart and kidney problems. (Doc.

19   # 38 at 8, Doc. # 39-3 at 9.) He also stated that the burning by the Native Americans near Unit

20   B greatly affected his health. (*Id*.) He was told to talk to his caseworker regarding a bed move.

21   (*Id*.) On December 12, 2011, Plaintiff submitted a request form where he asked Neubauer to

22   move him to Unit 2 because the smoke was affecting his health. (*Id*., Doc. # 39-3 at 11.) She

23   responded the following day that she had spoken to medical and was told he had no restriction,

24   but would be scheduled with a provider. (*Id*.)

25        On December 17, 2011, Plaintiff submitted a medical kite requesting care for back pain

26   and a flare-up of his sciatica. (Doc. # 38 at 8, Doc. # 39-3 at 12.) He was told to go to sick call

27   and be assessed by nursing. (*Id*.)

28

1    On December 22, 2011, NNCC physician, Dr. David Mar, noted that smoke "does not get

2    into vent 4. No problem. Cardiac clinic-cardiac function stable." (*Id*., Doc. # 39-1 at 9, 69.)

3    Defendants have provided Plaintiff's medical classification/restriction forms, none of

4    which indicate any medical restriction relative to smoke. (Doc. # 39-1 at 3, 44-52.)

5    Defendants Vidaurri and Neubauer argue that neither of them ever interfered with or

6    delayed Plaintiff's access to medical care or treatment. (Doc. # 38 at 13.) In addition, they

7    assert that Plaintiff had chest/heart issues prior to this incident, and these conditions have

8    been addressed by NDOC's medical department on a continuing basis. (*Id*.) They contend that

9    there is no evidence that these ongoing issues were exacerbated by Hewitt having to remain out

10   on the yard, on one occasion, for approximately thirty minutes. (*Id*.) When Plaintiff was

11   examined after this incident, he was evaluated as being in no acute distress with clear lungs.

12   (*Id*.) In addition, he denied any chest pain. (*Id*.) Plaintiff also apparently addressed this issue

13   when he saw Dr. Mar in December of 2011, and Dr. Mar indicated that smoke did not go into

14   the unit where Plaintiff was housed. (*Id*.) Finally, Defendants argue that they were not

15   deliberately indifferent to Plaintiff because they were unaware of any medical conditions,

16   observed that the smoke in the area was minimal, and allowed Plaintiff to go to the infirmary.

17   (*Id*.)

18   Plaintiff, on the other hand, argues that these defendants were deliberately indifferent

19   to his serious medical needs when they left him on the yard exposed to excessive smoke. (Doc.

20   # 44 at 2.) Plaintiff contends that the yard was full of thick, white smoke when he asked to be

21   let back inside. (*Id*. at 3.) He asserts that he told Vidaurri about his medical issues, that his

22   chest hurt, that he was choking and coughing and feeling dizzy as a result of the smoke

23   inhalation, and Vidaurri did not let him back in the unit for another thirty minutes. (*Id*.)

24   Taking Plaintiff's version of events as true—that he was forced to stay outside for thirty

25   minutes in the smoke, on one occasion, and that Neubauer refused his request for a bed

26   transfer to another unit—the court cannot conclude this is evidence of deliberate indifference

27   on the part of Vidaurri or Neubauer. There is no evidence in the record that this exposure to

28

10

smoke on a single occasion posed a serious risk to Plaintiff's health."[A] finding that the defendant's neglect of a prisoner's condition was an 'isolated occurrence' or an 'isolated exception' to the defendant's overall treatment of the prisoner ordinarily militates against a finding of deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 990 (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *rev'd on other grounds, WMX Tech., Inc. v. Miller*, 104 F.3d. 1133 (9th Cir. 1997).

Nor is there evidence that defendant Neubauer knew of and disregarded a serious risk to Plaintiff's health when she denied his request for a bed transfer to another unit. Instead, she followed up with the medical department concerning Plaintiff's request and was informed that there was no medical restriction concerning the smoke. Moreover, Plaintiff's medical evaluations following the alleged exposure to the smoke did not indicate any detriment to his health. His lungs were evaluated and no problems were found. Plaintiff was told, however, that if the smoke bothered him he should not go outside on Sundays when the ritual was performed.

Accordingly, the court recommends that summary judgment be granted in defendants Vidaurri and Neubauer's favor with respect to this claim.

**B. Eighth Amendment- Excessive Force**

**1. Legal standard**

The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. It "embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation and internal quotations omitted). The "unnecessary and wanton infliction of pain…constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

"[W]henever prison officials stand accused of using excessive physical force in violation of the [Eighth Amendment], the core judicial inquiry is…whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992); *see also Whitley*, 475 U.S. at 320-21; *Watts v.*

11

*McKinney*, 394 F.3d 710, 711 (9th Cir. 2005); *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327).

In determining whether the use of force is excessive, courts are instructed to examine "the extent of the injury suffered by an inmate[;]" "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of the forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

An inmate need not establish serious injury; however, the lack of serious injury is relevant to the Eighth Amendment inquiry. *See Wilkins v. Gaddy*, 130 S.Ct. 1175, 1178 (2010). "The extent of injury may also provide some indication of the amount of force applied." *Id.*

That being said, not "every malevolent touch by a prison guard gives rise to a federal cause of action...The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327); *see also Wilkins*, 130 S.Ct. 1178 ("An inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citing *Hudson*, 503 U.S. at 9)). "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Wilkins*, 130 S.Ct. at 1178-79. If the nature of the injuries is more than *de minimis*, but still "relatively modest," the inmate's damages will likely be limited. *See id.* at 1180.

**2. Analysis**

According to defendant Vidaurri, he was approached by Plaintiff's cellmate on December 22, 2011, who said that Plaintiff was threatening him. (Doc. # 38 at 5, Vidaurri Decl.

1 ¶ 16.) Vidaurri then walked to their cell and "observed Hewitt packing and/or throwing [his

2 cellmate's] belongings and attempting to move them out of the cell." (Doc. # 38 at 5, Vidaurri

3 Decl. ¶ 17.) Vidaurri asked Plaintiff what was going on and he said that he could not live with

4 his cellmate, was tired of him, and wanted a bed move. (*Id*.) Vidaurri ordered Plaintiff to stop

5 packing his cellmate's belongings and to get against the wall, and Plaintiff complied, still

6 explaining what he was doing. (Doc. # 38 at 5, Vidaurri Decl. ¶ 18.) Vidaurri proceeded to place

7 handcuffs on Plaintiff, and Plaintiff complained they were too tight, so Plaintiff adjusted them

8 and proceeded to walk Plaintiff away from his cell. (Doc. # 38 at 5, Vidaurri Decl. ¶ 19.) He

9 asserts that he only used that force which was needed to place Plaintiff in wrist restraints in

10 accordance with the training he received. (Doc. # 38 at 6, Vidaurri Decl. ¶ 21.) He contends that

11 he did not slam Plaintiff against the wall, bend him backwards or pick him up and "body slam"

12 him. (*Id*.) He did not notice that Plaintiff injured his leg when he was placed in wrist restraints.

13 (*Id*.) Nor did Plaintiff scream out in pain during the process. (*Id*.)

14 Next, Vidaurri placed Plaintiff in an administrative segregation cell and performed a

15 strip search pursuant to NDOC procedures, and Plaintiff did not exhibit injuries. (Doc. # 38 at

16 6, Vidaurri Decl. ¶ 20.) Plaintiff subsequently asked Vidaurri to call medical, claiming that his

17 back hurt, and Vidaurri contacted medical. (Doc. # 38 at 6, Vidaurri Decl. ¶ 21.) While they

18 were waiting for a nurse to arrive, Vidaurri claims Plaintiff still did not exhibit any signs of

19 injury. (*Id*.)

20 Vidaurri subsequently entered a notice of charges against Plaintiff regarding the incident

21 and was found guilty of the violation. (Doc. # 38 at 6, Vidaurri Decl. ¶ 23, Doc. # 38-4 at 4-10.)

22 The notice of charges form filled out by Vidaurri corroborates his version of events as described

23 above. (*See* Doc. # 38-4 at 4.)

24 During the relevant time period, Defendant Martinez was employed as a property

25 sergeant at WSCC's Unit 4. (*Id*. at 7, Doc. # 38-5 (Martinez Decl.) ¶¶ 1-2.) He has since retired.

26 (*Id*.) On December 22, 2011, Martinez heard a call over the radio that assistance was needed

27 in Unit 4B, so he left the property room and went downstairs to Unit 4B where he observed

28

1 Vidaurri with a black inmate of medium build facing the wall outside the tier in the unit. (Doc.

2 # 38 at 7, Martinez Decl. ¶ 6.) Vidaurri was in the process of placing handcuffs on Plaintiff.

3 Martinez did not recognize the inmate, nor did he know his name. (Doc. # 38 at 7, Martinez

4 Decl. ¶¶ 7-8.) According to Martinez, while Vidaurri was applying the handcuffs, Plaintiff was

5 standing freely and facing the wall. (Doc. # 38 at 7, Martinez Decl. ¶ 9.) He was not struggling

6 or under any apparent duress. (*Id*.) He did recall hearing Plaintiff state that he could not be

7 handcuffed behind his back, but does not know if he explained this. (Doc. # 38 at 7, Martinez

8 Decl. ¶ 10.) He did not hear Plaintiff complain about any leg issues. (*Id*.) When Plaintiff became

9 aware that Martinez was standing there, he said that he did nothing wrong and just wanted a

10 bed move. (Doc. # 38 at 7, Martinez Decl. ¶ 11.) Vidaurri finished placing the wrist restraints

11 on Plaintiff, and Martinez indicates that at no time did Vidaurri threaten Hewitt or use force

12 other than that which was necessary to secure Plaintiff. (Doc. # 38 at 7, Martinez Decl. ¶ 12.)

13 He did not observe Vidaurri slam or push Plaintiff, bend him backwards of "body slam" him.

14 (*Id*.) He did not observe any apparent injuries on Plaintiff's body. (Doc. # 38 at 8, Martinez

15 Decl. ¶¶ 13, 18.)

16     On that day, a medical report of incident, injury or unusual occurrence form was

17 completed. (Doc. # 38 at 9-10, Doc. # 39-1 at 23-24, 104.) Plaintiff complained of back pain and

18 numbness on his left side after being "hooked up." (*Id*.) He was seen by Dr. David Mar that day,

19 and the plan was to continue with medication ordered for back pain spasm from December 20,

20 2011. (*Id*., Doc. # 39-1 at 69.) The next day, December 23, 2011, Plaintiff submitted a medical

21 kite complaining of severe back pain after "being assaulted by Officer Vidaurri" and a "busted

22 leg that was bleeding and in great pain." (Doc. # 38 at 10, Doc. # 39-4 at 3.) He requested x-

23 rays of his back. (*Id*.) Medical responded that Plaintiff had been seen by medical on

24 December 22, 2011, was evaluated by nursing staff, and was receiving medication for back pain

25 which was previously ordered on December 20, 2011. (*Id*.) Nevertheless, he was scheduled to

26 see a doctor the following week. (*Id*.)

27     Defendants Vidaurri and Martinez argue that Vidaurri used reasonable force in

28

14

1   handcuffing Plaintiff on December 22, 2011, and taking him to the administrative segregation

2   cell. (*Id*. at 16.)

3          Plaintiff, on the other hand, contends that Vidaurri did use excessive force, as described

4   in his complaint, while Martinez did nothing to intervene. (Doc. # 44.)

5          The court finds that a genuine dispute of material fact exists as to Plaintiff's excessive

6   force claim. Defendants Vidaurri and Martinez maintain that Vidaurri only used that force

7   which was necessary to secure Plaintiff after an incident involving his cellmate. Plaintiff has a

8   very different version of events, contending that Vidaurri slammed Plaintiff against the wall,

9   pinned his arms behind his back and bent him backwards, while Plaintiff screamed out in pain,

10  and then "body slammed" him, cutting his leg open, and then dragged him to another cell.

11  Plaintiff further asserts that Martinez stood by and watched and failed to come to his aid. While

12  Vidaurri and Martinez take the position that Plaintiff suffered no injury as a result of the

13  incident, Plaintiff claims that his leg was cut and that he suffered back pain. The medical

14  records appear to indicate Plaintiff suffered from back pain prior to this incident, but Plaintiff

15  maintains that the incident exacerbated this condition.

16         The foregoing clearly demonstrates the existence of a genuine dispute of material fact

17  concerning the need for application of force, the amount of force used, and the extent of any

18  injuries suffered by Plaintiff.

19         As a result, the court recommends that the motion for summary judgment of defendants

20  Vidaurri and Martinez be denied as to Plaintiff's excessive force claim in Count II.

21  **C. QUALIFIED IMMUNITY**

22         Defendants assert that they are entitled to qualified immunity because they were not on

23  notice that their conduct was unlawful. (Doc. # 38 at 18-19.) As the court noted above, a

24  genuine dispute of material fact exists as to Plaintiff's excessive force claim that precludes a

25  determination of qualified immunity at summary judgment. *See Serrano v. Francis*, 345 F.3d

26  1071, 1077 (9th Cir. 2003).

27  ///
///

28  ///

15

**IV. RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Defendants' motion for summary judgment, as follows:

(1) **GRANTING** summary judgment to defendants Vidaurri and Neubauer as to Plaintiff's Eighth Amendment medical care claim in Count I; and

(2) **DENYING** summary judgment to defendants Vidaurri and Martinez as to Plaintiff's Eighth Amendment excessive force claim in Count II.

The parties should be aware of the following:

1.    That they may file, pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule IB 3-2 of the Local Rules of Practice, specific written objections to this Report and Recommendation within fourteen (14) days of receipt.  These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the District Court.

2.    That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1), Fed. R. App. P., should not be filed until entry of the District Court's judgment.

DATED: September 3, 2013.

_____
WILLIAM G.  COBB
UNITED STATES MAGISTRATE JUDGE

16